NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Plaintiff, *v.* EDMUND P. COTTLE and Others, Respondents, Impleaded with THE PEOPLE OF THE STATE OF NEW YORK, Appellant.

Fourth Department, March 22, 1919.

Eminent domain — appeal — review of order of referee — authority of Appellate Division — effect of confirmation of report of commissioners upon title — when relation of vendor and vendee effected — vendor and purchaser — effect of execution of valid contract of sale — ownership of purchase money — prosecution of appeal by executors — right of executors to purchase at public sale — affirmance of order directing payment of award in condemnation proceedings notwithstanding claim of State in portion of land of negligible value.

Where, upon an appeal from an order in a condemnation proceeding denying a motion to confirm the report of a referee, it appears that there was no sharp conflict in the testimony of witnesses, and that important facts do

not depend upon the veracity of witnesses, the Appellate Division may adopt or reject the findings of the referee or those of the Special Term and make findings warranted by the evidence.

While in a condemnation proceeding pursuant to the General Railroad Law (Laws of 1850, chap. 140, as amd. by Laws of 1876, chap. 198), the title to the land sought to be taken does not pass to the petitioner by virtue of the confirmation of the report of the commissioners, where the owner accepts the report and the same is confirmed upon his motion, he will be held to have elected to stand upon his lien, and as between him and the petitioner his relation becomes that of vendor, and the relation of the petitioner that of vendee.

Where in an action by a landowner against a petitioner in prior condemnation proceedings to foreclose the plaintiff's lien for the amount of the award, the defendants plead a contract made by the plaintiff with them for the sale of the land in question and a counterclaim due to a breach of said contract, a judgment determining the validity of the contract and the damages resulting from the breach thereof established the relation of vendor and vendee between the landowner and the petitioner.

An owner of real estate from the time of the execution of a valid contract for its sale is to be treated as the owner of the purchase money and the purchaser of the land is to be treated as the equitable owner thereof. The purchase money becomes personal property and passes to the executors of the owner upon his death.

An appeal by a landowner from a judgment in an action brought by him to foreclose his lien for an award in condemnation proceedings *held* not to have been prosecuted by his executors in bad faith, although it had been permitted to slumber for a long time after it was taken.

Purchase of land at public sale by executors, individually, *held* not to be fraudulent, where the property was subject to a large amount of taxes and had been sold at tax sales and did not seem to invite purchasers, and where said executors were large creditors of the estate which was insolvent.

Where there is a conflicting claim between the State and creditors of a deceased landowner involving the proceeds of a one-foot strip of land along a lot ninety-three feet in width, and it appears that said strip of land is of doubtful commercial value; that the creditors will be entitled to follow the money representing the value of said strip of land into the hands of the heirs at law of the deceased or into the treasury of the State, an order of the Special Term directing the payment of said proceeds to the creditors should be affirmed.

APPEAL by the defendant, The People of the State of New York, from an order of the Supreme Court, made at the Erie Special Term and entered in the office of the clerk of the county of Erie on the 2d day of January, 1918, denying its motion to confirm the report of a referee and directing the payment to the respondents of a certain deposit in the Marine National

Bank of Buffalo, representing the amount of the award in a proceeding instituted by the New York Central and Hudson River Railroad Company for the condemnation of a certain piece or parcel of land situate in the city of Buffalo.

*Wilber W. Chambers, Deputy Attorney-General,* and *Clarence R. Cummings* [*Merton E. Lewis, Attorney-General,* attorney], for the appellant.

*Edmund P. Cottle,* for the respondents Cottle and others.

*Adelbert Moot* [*Moot, Sprague, Brownell & Marcy,* attorneys], for the respondent Munro.

*Harold J. Adams* and *Charles F. Blair* [*Persons & Blair,* attorneys], for the respondents Hill.

DE ANGELIS, J.:

The order under review was made under section 3378 of the Code of Civil Procedure, to determine conflicting claims to moneys on deposit in the Marine National Bank of Buffalo, N. Y., representing an award of damages in a condemnation proceeding. The controversy acrose over the claim of the appellant, the People of the State of New York, that one John J. P. Read, at the time of his death, owned the real estate acquired by the petitioner in the proceeding and that, although he left a will, he died intestate as to such real estate and the same escheated to the State, on the one hand, and the claim, on the other hand, that the property belonged to Edmund P. Cottle and others, the respondents. The referee to whom the matters in dispute were referred made a report accompanied by an opinion, in favor of the appellant. Upon the hearing at Special Term upon the motion made by the appellant to confirm that report, the court made the order appealed from, deciding that the respondents Cottle and others were entitled to the moneys.

Such real estate was a piece or parcel of land situate in the city of Buffalo, 93 feet wide in front on the northerly side of Carroll street and the same width in the rear and 100 feet deep.

The condemnation proceeding in which the order under review was granted was begun in February, 1914. The

defendants interposed elaborate . answers to the petition. Pursuant to a stipulation entered into on May 15, 1914, between the petitioner, plaintiff and the defendants, an order was made by the Supreme Court at a Special Term held in the city of Buffalo on the 26th day of May, 1914, permitting the petitioner to proceed to judgment as if no answer had been interposed, in so far as it affected the rights of the petitioner, to condemn the land, upon certain conditions, and among them that the amount of the award should be deposited in the Marine National Bank of Buffalo there to remain subject to the order of the court determining the disposition thereof pursuant to section 3378 of the Code of Civil Procedure.  This order appointed commissioners.  The commissioners made their report June 13, 1914, in which they determined the amount of the compensation to be made for the land to be $15,000.  That report was confirmed by an order of the Erie Special Term made July 27, 1914, and the amount of the award was deposited in the Marine National Bank, and, as already appears, that amount is the subject of this litigation.

On or about the 13th day of April, 1883, John J. P. Read was the owner in fee and in possession of this land, and on that day the New York, West Shore and Buffalo Railway Company presented to the Supreme Court at a Special Term in the city of Buffalo its petition under the General Railroad Law of 1850, as amended by chapter 198 of the Laws of 1876, in a proceeding instituted to acquire title to all of the land above described, *except a strip one foot in width on the northerly end thereof*, with proof of service of the same upon Read and others, whereupon such proceeding was adjourned from time to time until the 1st day of September, 1883.

On the 31st day of May, 1883, and while such proceeding was pending, John J. P. Read made a contract in writing and under seal with the railway company for the sale by him to the company of the real estate described in the petition for the sum of $13,500 payable within one month from the date of the contract.  The contract provided that upon payment of the purchase price, Read was to convey the property by a full covenant deed to the company.  In this contract Read covenanted to save the company harmless from certain

judgments against him which were in litigation and to pay all taxes which were liens on the property on the 31st day of May, 1883, and to convey the property free and clear from all incumbrances, but the company was to pay the city tax of 1883.

On the 31st day of May, 1883, there were outstanding and unpaid taxes and local assessments levied and assessed against this property during a period of many years and to a large extent, and there also were outstanding tax sales of the property.

In July, 1883, the railway company tendered the purchase price to Read and demanded the conveyance that he had undertaken to deliver and called upon him to pay the taxes which he had undertaken to pay in his contract. Read failed to pay the taxes. Later in the month of July, 1883, the railway company tendered to Read a deed to be executed by him to it and Read refused to execute the deed solely upon the ground that it failed to contain a provision for the payment by the railway company of the city tax for the year 1883. Thereafter and on the 30th day of July, 1883, Read tendered to the railway company a deed of conveyance of the land in question containing the covenants referred to in the contract and demanded payment of the purchase price. The railway company refused to accept the deed on the ground that the taxes which were liens on the property on the 31st day of May, 1883, had not been paid. The railway company on the 3d day of September, 1883, applied to the court for the appointment of commissioners in the condemnation proceeding already referred to and which had been held by adjournment to that day. Read appeared in the proceeding and interposed a verified answer in which he set forth the making of the contract for the sale of the land referred to and that he had done everything in his power to carry out the contract on his part and charged that the railway company had declined and refused to carry out the contract on its part. The issues raised by the answer were thereafter tried at Special Term and decided in favor of the railway company, and thereupon the court made an order appointing commissioners to ascertain and appraise the compensation to be made to the owners or persons interested in the property

sought to be acquired. The commissioners, after viewing
the premises and taking the proofs, on the 26th day of
December, 1883, made and signed a report in which they
found that the compensation which ought to be made by
the railway company to the owners or persons interested in
the property was $14,500. Before the commissioners it was
stipulated by the respective parties that the sum of $617.45
out of the award to be made for the property should be
deposited to protect the contested claim of the county of
Erie for taxes and that the sum of $1,325.57 out of such award
should be deposited to protect the contested claim of the city
of Buffalo for taxes, and in pursuance of the stipulation the
commissioners reported that such sums respectively should
be deposited as stated in the stipulation and that the balance
of the amount awarded by them, to wit, the sum of $12,556.98,
be paid to Mr. Read as the owner of the property. Thereafter
and on the 16th day of February, 1884, Read made a motion
at a Special Term of the Supreme Court to confirm the report
of the commissioners, which motion was opposed by the rail-
way company, but it was granted and an order was made
confirming the report and directing the deposit of the amounts
specified in the report and the payment of the balance to
Read as therein directed. The order was entered on the
21st day of February, 1884, and recorded in the office of the
clerk of Erie county.

On or about the 9th day of June, 1884, in an action to
foreclose a general mortgage on the property of the railway
company, Theodore Houston and Horace Russell were
appointed receivers of the property of the railway company.

Thereafter and on the 30th day of September, 1884, the
receivers deposited in the Erie County Savings Bank in the
city of Buffalo the amounts required to be deposited by the
order of confirmation to protect the city and county against
claims for taxes with interest thereon. The balance of the
award directed to be paid to Read was never paid.

In the month of July, 1885, Read began an action in the
Supreme Court against the railway company and the receivers
in which the complaint set forth the condemnation proceeding
above referred to and the failure of the railway company to
pay him the amount awarded to him therein. There was

also in the complaint an allegation that the railway company was insolvent and the appointment of receivers was set forth. The complaint further contained the following allegation and prayer for relief:

" That this plaintiff has the possession of said land and a lien upon the same for money due and unpaid as aforesaid and the said corporation, although often requested since said money became due, has hitherto neglected and refused to pay the same or any part thereof.

" Wherefore the plaintiff demands a judgment of this Court whereby the said defendants and all persons claiming through or under them subsequent to the commencement of this action shall be barred and foreclosed of and from all right, title, interest, claim and demand whatsoever in and to said land and premises and every part and parcel thereof and for such further or other relief as the court shall deem proper in the premises," etc.

The defendants interposed an answer to the complaint in which some of the allegations of the complaint were denied and there were set forth the contract made by Read for the sale of the property to the railway company already referred to, Read's failure to perform the contract on his part and a counterclaim for alleged damages sustained by the railway company owing to the failure of Read to perform the contract of sale on his part, such damages being the expenses attending the continuation of the condemnation proceedings and the difference between the contract price and the award. In the prayer for relief the defendants demanded judgment that the complaint be dismissed, or that the defendants' damages be deducted from the plaintiff's claim and upon payment of the balance the defendants be permitted to redeem the land and the plaintiff ordered to convey the same to the defendants, or that the land be ordered sold to satisfy any liens the plaintiff might have thereon; that the amount of such liens be adjusted by deducting from the plaintiff's claim the amount of damages sustained by the defendants because of the plaintiff's breach of his contract to sell to the defendant railway company such land; and that the defendants have such other or further relief in the premises as to the court shall seem just and proper.

The action was tried at the Erie Equity Term on the 9th day of December, 1885. Decision was made therein and judgment thereon entered on the 26th day of March, 1886. The decision and judgment recognized the validity of the contract of sale already referred to and adjudged that the plaintiff was bound to perform the covenants of the contract and that the plaintiff by his acts waived the limitation of time for the fulfillment of the contract on the part of the railway company. Such decision and judgment allowed the counterclaim, determined the amount of the plaintiff's lien, permitted the defendants to redeem the property by paying that amount within a certain time, and in the event of their failure so to redeem, ordered the sale of the property to satisfy the plaintiff's lien. The plaintiff filed exceptions to the decision and appealed from the judgment to the General Term of the Supreme Court on the 26th day of March, 1886.

On the 24th day of December, 1891, Read executed and delivered to one Samuel Wasson a bond for the payment of $3,000 within five years from the date thereof, or sooner, with interest, and a mortgage to secure the same covering with other premises the land in question. This mortgage was recorded in the Erie county clerk's office on the 29th day of December, 1891.

Read died on the 1st day of February, 1896, leaving a last will and testament and a codicil thereto, but intestate as to his real estate. The will was dated March 9, 1894, and what purports to be a copy of the same appears in the record. The codicil was executed January 3, 1896, and a copy of the same appears in the record.

Dr. Clayton L. Hill and Rowena, his wife, both being mentioned as legatees, and the former as a devisee in the original will, and Dr. Hill, being one of the executors, contested the codicil in the Surrogate's Court. As the result of the contest both the will and codicil were admitted to probate and letters testamentary thereon were issued to Octavius O. Cottle and Dr. Clayton L. Hill as the executors thereof on the 4th day of June, 1896.

On the 14th day of July, 1896, at the Erie Special Term of the Supreme Court, an order was made reviving the action brought by Read against the New York, West Shore and

Buffalo Railway Company and continuing the same against such railway company and Horace Russell as sole surviving receiver of the property of the railway company and substituting Octavius O. Cottle and Clayton L. Hill as such executors as plaintiffs and appellants in the place and stead of John J. P. Read in such action, and thereupon the appeal therein was prosecuted and heard in the Appellate Division, and thereafter the judgment was affirmed and the judgment of affirmance was entered on the 29th day of April, 1898. The railway company and its receiver having declined to redeem the property pursuant to the judgment hereinbefore mentioned, an order was made at the Erie Special Term of the Supreme Court on the 10th day of November, 1898, appointing one William G. Kilhoffer referee in the place of Livingston Lansing, named in the original judgment, to sell the property pursuant to the judgment. After due notice, such referee, on the 16th day of November, 1898, sold the property at public auction pursuant to the judgment to Octavius O. Cottle and Clayton L. Hill for the sum of $1,000 subject to the various taxes, tax liens and other incumbrances thereon, and thereafter and on the 27th day of December, 1898, such referee executed and delivered to Octavius O. Cottle and Clayton L. Hill as individuals a conveyance of such property pursuant to such judgment. This deed was recorded on the 24th day of May, 1900.

After the probate of the will and codicil, Clayton L. Hill and Rowena, his wife, brought an action against Octavius O. Cottle as executor of such will and codicil to set aside the codicil. While this action was pending, Octavius O. Cottle and Clayton L. Hill, for the purpose of settling their differences, entered into several agreements in writing. One of these agreements, dated June 18, 1898, recited the death of Read and that he was indebted to each of the parties; that a considerable portion of Read's estate consisted of real estate much of which had been sold for taxes and against which there were tax liens of questionable validity; that owing to the amount of such claims and the complicated condition of the assets of the estate and other indebtedness it was probable that the proceeds of the estate would be insufficient to satisfy all creditors; and that various suits and proceedings relating

to the claims of the parties were pending.  By this agreement it was provided and agreed for the purpose of compromising and settling as between the parties the amounts justly due to each from such estate, that the indebtedness of the estate to each of the parties should be fixed at the sum of $50,000. It was further agreed that Cottle should have certain moneys deposited in the Erie County Savings Bank in addition.  This agreement provided for the adjustment of certain indebtedness to others.  By another agreement, dated June 18, 1898, each assigned to the other an undivided half of all claims, devises, legacies, bequests and demands in his favor against the estate of Read.  In this agreement the parties recited that it was their intention that each should have a one-half interest and right in the estate of Read except as to the specific claims otherwise provided in a certain agreement of even date.  There was an agreement of June 30, 1898, which was executed by the parties as individuals and also as executors of Read's will.

On the 28th day of June, 1900, the Surrogate's Court of Erie county, in a proceeding for that purpose, allowed a claim presented by Clayton L. Hill against the Read estate for the sum of $54,229 and in the decree it was recited that the same was made without prejudice to the right of the State of New York, or of any other person interested in Read's estate to be heard on the final accounting.

On the 26th day of November, 1902, Hill executed and delivered a bond in the sum of $1,800 and a mortgage covering an undivided one-half interest in the premises in question, with other lands, to Josiah G. Munro as collateral security for the payment of $1,800, upon which there remained unpaid on the 26th day of December, 1916, the sum of $2,664.

On the 25th day of December, 1905, Clayton L. Hill died intestate leaving three children as his only heirs at law and next of kin, to wit, Florence R. Hill, Robert C. Hill and Evelyn C. Hill.

On the 28th day of December, 1905, Octavius O. Cottle, as sole surviving executor of the last will and testament of John J. P. Read, executed and delivered a deed of the premises here in controversy to his daughter, Marion W. Cottle, for the expressed consideration of one dollar.

Octavius O. Cottle died on the 25th day of February, 1912,

leaving a last will and testament which was duly admitted to probate, wherein he devised and bequeathed his entire estate to Edmund P. Cottle, Marion W. Cottle and Jennie W. Cottle, and appointed them executors. They qualified as such executors and are adults and parties to this action.

The evidence fairly establishes the fact that both Octavius O. Cottle and Clayton L. Hill were large creditors of John J. P. Read at the time of his death. Read lived with Hill and his family for many years. Hill had concededly devoted a large part of his time in the service of Read. Cottle had been for years Read's counsel and had performed services for Read in many litigations. Read's will recognized his indebtedness to Cottle. Read's will indirectly recognized his obligation to Hill. It is to be observed that that will stood down to the 3d day of January, 1896, when he made the codicil withdrawing his bequests and devises to Hill and his wife. Read died February 1, 1896, less than a month after the change made by the codicil. There is nothing to show what brought about this change but I think we may consider all the circumstances as bearing upon the attitude of both Cottle and Hill in their treatment of Read's estate in view of its peculiar condition and their rather unusual relation to it.

(1) The appellant urges that the learned justice at the Special Term was without authority to disapprove the facts found by the referee in his report. Section 3378 of the Code of Civil Procedure, under which the order of reference was granted, is as follows: " If there are adverse and conflicting claimants to the money, or any part of it, to be paid as compensation for the property taken, the court may direct the money to be paid into the court by the plaintiff, and may determine who is entitled to the same, and direct to whom the same shall be paid, and may, in its discretion, order a reference to ascertain the facts on which such determination and direction are to be made."

The order of reference, after naming the referee, indicated the duty he was to perform as follows: " To hear the proofs submitted by the parties hereto in regard to the right, title and claims of the various defendants to the award or fund now on deposit with the Marine National Bank of Buffalo, and the liens upon claims and set-offs against said fund, and

that he make a report with all convenient speed to this court of the evidence taken by him and of the facts deemed by him to be established thereby, and his opinion thereon."

It will be observed that the order of reference does not follow the language of the statute. It may be that the justice at Special Term, in making the order, intended to limit the power of the referee. It may be that he had no such intention. It is argued by the appellant that the power of the referee was plenary as to the facts and that the Special Term, upon the motion to confirm the referee's report, had no right to disapprove the findings upon the facts and make its own findings. We need not pass upon this question because we are clothed with authority to disapprove the findings of fact made by the referee, in any event, and we may adopt or reject his findings or those of the Special Term if the evidence requires such action on our part. What the propriety of the exercise of such authority by us might be in a case where there was a sharp conflict in the testimony of witnesses called at the trial and where important facts were to depend upon the veracity of witnesses, there is no conflict of that nature in this case, so that we are free to make such findings upon the evidence as the same in our judgment warrants.

(2) The counsel for the appellant argues, and he has in his support the backing of the report of the learned referee, that the land condemned was real estate of which John J. P. Read died seized in fee; that as to the same Read died intestate, although he left a will which was duly probated; that he left sufficient personal property to pay his debts and legacies; that he left no widow or heir at law; and that this land escheated to the State of New York.

We shall first consider the status of that portion of such land as was the subject of the condemnation proceeding taken by the New York, West Shore and Buffalo Railway Company in the year 1883, to wit, all of the land condemned in the proceeding in which the order under review was made, except a strip one foot in width from the northerly or rear end thereof.

It already appears that the proceeding taken by the West Shore was taken pursuant to the General Railroad Law (Laws of 1850, chap. 140, §§ 14-21, as amd.), section 18 thereof having

been amended by chapter 198 of the Laws of 1876.   The report made by the commissioners was confirmed upon the motion of Read and the order of confirmation was entered and a copy of the same recorded.   This action on the part of Read resulted under the provisions of section 18 of the General Railroad Law of 1850, as amended in 1876, in making the amount of the award a debt against the railway company and a lien on the land that might be enforced and collected by action at law or in equity in the Supreme Court, with costs.   While the contention made by the appellant that the title to the land did not pass to the railway company by virtue of the confirmation of the report of the commissioners, under the terms of section 18 of the General Railroad Law of 1850, as amended (*Lent* v. *N. Y. & M. R. Co.*, 130 N. Y. 504), is correct, we think that in view of the fact that Read accepted the report and the same was confirmed upon his motion, he elected to stand upon his lien, and as between him and the railway company his relation became that of vendor, and the relation of the railway company that of vendee.   In *Matter of Rhinebeck & Connecticut R. R. Co.* (67 N. Y. 242, 247), a condemnation proceeding under the General Railroad Law of 1850, the Court of Appeals speaking through Judge ANDREWS held that where the report of commissioners was confirmed upon the motion of the railroad company, as between the landowner and the company, the relation of vendor and vendee was established.   There the landowner had obtained an order directing the railroad company to pay the award.   (See, also, *Matter of Commissioners of Palisades Interstate Park*, 216 N. Y. 104, 110, 111.)   In this case it would seem that the landowner by moving to confirm the report of the commissioners elected to assume the relation of vendor.   While he held the legal title, he held it simply in trust to protect his lien.

But there is another aspect of this case which seems to me conclusively to show that the relation of vendor and vendee existed between Read and the railway company.   In the action brought against the West Shore and its receivers to foreclose his lien for the amount of the award in the West Shore condemnation proceeding referred to in the foregoing, the defendants set forth in their answer the contract made

by Read with the railway company for the sale of the land involved in that proceeding for the sum of $13,500, the breach thereof by Read and a counterclaim due to that breach made up of the expenses of the continuation of the condemnation proceeding after the contract plus the difference between the amount of the contract price and the amount of the award. In the decision and judgment of the court the binding force of the contract was adjudicated and the damages growing out of Read's breach of the contract determined and deducted from the amount of the award. So that the relation of Read as vendor and the railway company as vendee was clearly established by that adjudication.

It is well settled that the owner of the real estate from the time of the execution of a valid contract for its sale is to be treated as the owner of the purchase money and the purchaser of the land is to be treated as the equitable owner thereof. The purchase money becomes personal property.

One of the conclusions of law in the decision in Read against the West Shore and its receivers was to the effect that Read had waived the limitation of the time for the fulfillment of the contract by the railway company which is specified in the contract itself. The effect of that adjudication was that Read should specifically perform his contract.

We conclude that at the time of the death of Read his interest in the land condemned in the West Shore proceeding was personal property and that it, therefore, passed to his executors.

(3) We do not think that the executors of Read's will were guilty of bad faith in prosecuting the appeal taken by him from the judgment in the action brought by him to foreclose his lien for the award in the West Shore condemnation proceeding. The appeal had been taken by Read, and, although it had been permitted to slumber for a long period after it was taken, we do not discover any basis for the claim that it was prosecuted after his death in bad faith.

(4) The purchase of this land at public sale in the foreclosure action by Cottle and Hill individually was not fraudulent. The property was subject to a large amount of taxes and had been sold at tax sales and did not seem to invite purchasers. Cottle and Hill were large creditors of the Read

estate, and in view of the probable insolvency of that estate, Cottle and Hill had a right to protect themselves.

(5) The appellant argued that it had at least established the escheat of the strip of land one foot in width on the north or rear end of the lot which has been condemned in the proceeding in which the order under review was granted. The claim is made that the justice at Special Term overlooked this strip of land. This may possibly be true, but it is more probable that he regarded it as negligible. If we were to adopt the rule that a small part of the land is worth such proportion of the value of the whole lot as such part would bear to the whole lot, then this strip of land would be worth one-hundredth part of the whole award of $15,000, or $150. But we would not be justified in adopting any such rule. This strip of land is of doubtful commercial value, probably of so little value as to be negligible. However, whatever its value may be, it is represented by the money on deposit in the bank. As it is reasonable to believe that the indebtedness of the Read estate to the Cottle and Hill estates amounts to more than the value of the property of the Read estate, and as the next of kin of Cottle and Hill would be entitled to follow the money representing the value of this strip of land into the hands of the heirs at law of Read, or into the treasury of the State, the result reached by the Special Term should not be interfered with. It is a short cut to a just result.

It follows from the foregoing that new findings must be made to conform to this opinion, the findings of the referee at variance therewith disapproved, and the order appealed from affirmed, with costs.

All concurred.

Order affirmed, with costs. Order to be settled before DE ANGELIS, J., on two days' notice, at which time proposed new findings to be made and findings to be disapproved may be submitted.